## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| _____ | ) | |
| ZOLON PCS II, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 23-1420 |
| | ) | |
| THE UNITED STATES, | ) | Filed: August 29, 2024 |
| | ) | |
| Defendant, | ) | Re-issued: September 10, 2024[*] |
| | ) | |
| and | ) | |
| | ) | |
| EXACTA SOLUTIONS, LLC, *et al.*, | ) | |
| | ) | |
| Defendant-<br>Intervenors. | ) | |
| _____ | ) | |

## OPINION AND ORDER

This bid protest challenges a corrective action taken by the National Geospatial-Intelligence Agency ("NGA") related to a solicitation for management support services. Twenty-three offerors bid on the solicitation, and the NGA awarded contracts to five offerors. Zolon PCS II, LLC ("Plaintiff"), a disappointed offeror, protested the awards at the GAO, arguing that the NGA unreasonably evaluated its proposal and that three awardees were ineligible due to System for Award Management ("SAM") registration lapses. The NGA took corrective action in response. As part of that corrective action, the NGA issued a deviation from the SAM registration requirement and incorporated the deviation into an amended solicitation. In this action, Plaintiff

---

[*] The Court issued this opinion under seal on August 29, 2024, and directed the parties to file any proposed redactions by September 5, 2024. The opinion issued today incorporates the redactions proposed by Plaintiff. No Defendant submitted proposed redactions or objected to Plaintiff's proposed redactions. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 17). Redacted material is represented by bracketed ellipses "[. . .]."

argues that the NGA's deviation and solicitation amendments were arbitrary, capricious, and contrary to law and procedure. Four of the five original awardees have intervened as defendants: Compass, Inc. ("Compass"); Logic Gate, LLC ("Logic Gate"); Exacta Solutions, LLC ("Exacta"); and Credence Dynamo Solutions, LLC ("Credence"). All parties except for Logic Gate moved for judgment on the administrative record.

For the reasons discussed below, the Court **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record and **DENIES** the Government's and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record.

## I.   BACKGROUND

### A.   The Solicitation

This bid protest concerns Solicitation No. HM0476-21-R-0023 ("Solicitation") for a procurement referred to as "CLOVER." The CLOVER contract is intended to support the NGA with acquisition management services, financial management services, and business management services. Admin. R. ("AR") 949, ECF No. 50.[1] The Solicitation provided for a multiple-award, indefinite-delivery, indefinite-quantity ("IDIQ") contract to provide these services. *Id.* The NGA planned to award up to five IDIQ contracts under the Solicitation. AR 1066. The Solicitation was amended six times prior to award. *See* AR 1242–96 (Amendment 0001), 1297–2554 (Amendment 0002), 1555–1697 (Amendment 0003), 1698–1863 (Amendment 0004), 1864–2011 (Amendment 0005), 2012–19 (Amendment 0006).

As explained in the Solicitation, the NGA intended to evaluate offerors using a best value continuum, with the Highest Technically Rated Offerors with a Fair and Reasonable Price

---

[1] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers.

constituting the best value basis.  AR 1996.  Offerors were instructed to submit offers in multiple volumes addressing the following: Volume 1 – Contract, Volume 2 – Relevant Experience Evaluation, Volume 3 – Past Performance, Volume 4 – Security Factor, Volume 5 – Verification and Assessment, Volume 6 – Risk Assessment, and Volume 7 – Price.  AR 1998–2007.  As part of Volume 5, the Solicitation required offerors to submit a completed Document Verification and Self Scoring Sheet in which the offerors would score each volume of their proposals and assign a point value out of a maximum 91,500 total points.  AR 1175–79, 2005.

The Solicitation advised offerors that "[t]he Government will strictly enforce all proposal submission requirements outlined in Section L," Instructions, Conditions, and Notices to Bidders. AR 1996.  Relevant to this protest, one such requirement was compliance with FAR 52.204-7, System for Award Management.  AR 1970.  FAR 52.204-7 provides that offerors must be registered in SAM at the time they submit an offer and must "continue to be registered until time of award" and through contract performance.  48 C.F.R. § 52.204-7(b)(1).

For purposes of the evaluation, the Solicitation provided that the NGA would first "perform an initial screening of all proposal submissions to determine acceptability and compliance as outlined [in Section M, Evaluation Factors for Award], and in accordance with Section L of the RFP."  AR 1997.  It advised offerors that a "proposal may be considered non-compliant and may be immediately disqualified" if it lacked required information.  *Id.*  The Solicitation also reserved the contracting officer's discretion to allow minor clarifications.  *Id.*

The NGA would then organize the proposals from highest to lowest score, using the offerors' self-scoring sheets.  *Id.*  Beginning with the preliminary top five proposals, the NGA would evaluate, validate, and adjust each of the top five offerors' self-scores.  *Id.*  The Solicitation explained the process as follows:

3

After a complete evaluation of the Offeror's Self-Scoring Sheet (Attachment J.17) and all scores appropriately accepted or refuted, the Offeror in question will then be re-ranked based upon their revised preliminary score. If the Offeror remains in the Top 5 after the deduction and re-ranking, the evaluation of the offer shall continue. If the Offeror does not remain in the Top 5, the next-highest rated Offeror who passes the Acceptability Review shall be moved forward into the Top 5, and evaluation shall begin on that offer.

Once the Top 5 highest scored offers have been evaluated and validated, the evaluation team will then check to verify that these Offerors have proposed fair and reasonable pricing.

*Id.* Once the NGA determined the top five offerors, it would cease evaluations and issue the awards. AR 1998. To allow time for the evaluation process, the Solicitation required that proposals be firm and valid for at least 180 days from the offer deadline. *Id.*

## B.    Evaluation and Award

Twenty-three offerors submitted proposals by the March 29, 2022, deadline. AR 18169. According to the Source Selection Evaluation Board ("SSEB") Report, the NGA conducted the initial screening "to ensure proposals were submitted in accordance with Sections L and M of the RFP." *Id.* During the screening, it deemed two offerors non-compliant and eliminated them from further consideration. AR 18182–83. Consistent with the Solicitation, the NGA then organized the 21 remaining proposals from highest to lowest based on self-scores and evaluated the self-scores of the top five proposals. AR 18170. When an offeror's validated score pushed it outside of the top five, the NGA evaluated the next-highest rated offeror. *Id.* This process continued until the top five "highest scored Offerors had been evaluated and validated," at which point "the evaluation team then checked to verify that these Offerors had proposed fair and reasonable pricing." *Id.* The NGA ultimately evaluated all self-scores and re-ranked the proposals after each evaluation. AR 18183–351.

During this evaluation process, Plaintiff went from being ranked second of the self-scored proposals with [. . .] points (tied with Columbia Alliance, which was ranked first) to having the third-lowest validated score with [. . .] points. AR 18183–84, 18350–51. Compass, Logic Gate, and Exacta were outside of the top five based on self-scores, but reached the top five after the NGA validated the scores. AR 18183–84, 18350–51 (finishing first, third, and fourth, respectively). Credence remained in the top five throughout the evaluation, dropping from the fourth ranked self-score to fifth after validation. *Id.* Innovate Now was the final member of the top five based on validated scores. AR 18350. It moved from 12th place to second place. AR 18183–84, 18350–51. The NGA then conducted a price evaluation for the top five offerors and found that each proposal's price was fair and reasonable. AR 18352–55. On May 23, 2023, the NGA awarded a contract to each of the top five offerors. AR 18359–63, 18366–654. The NGA notified Plaintiff of its unsuccessful offer on the following day. AR 18360.

### C.     GAO Protests

After post-award debriefings, Plaintiff filed a protest at the GAO, asserting that the NGA unreasonably evaluated its proposal and that at least one awardee (Exacta) was ineligible based on its failure to comply with the SAM registration requirement provided in FAR 52.204-7(b)(1). AR 18792–20364. One week later, Plaintiff filed a supplemental protest arguing that three awardees (Credence, Exacta, and Innovate Now) were ineligible on that basis. AR 20365–542. As the undisputed evidence in this protest shows, between the deadline to submit proposals and the date awards were issued, these awardees had lapses in their SAM registrations. Credence's registration lapsed from April 22, 2022, to April 27, 2022. *See* Exs. to Pl.'s Compl. at 49–54 (showing Credence's lapse in SAM.gov), ECF No. 1-1. Exacta's registration lapsed from October 28, 2022, to December 22, 2022. *See id.* at 55–58. Innovate Now's registration lapsed from June 6, 2023,

to June 7, 2023.  *See id.* at 59–64.  Plaintiff argued that FAR 52.204-7(b)(1) requires offerors to be continuously registered in SAM from time of offer through award, and the lapses in the three awardees' SAM registration rendered them ineligible for award.  AR 20397–400.  In advancing this argument, Plaintiff relied on a then-new Court of Federal Claims decision, *Myriddian, LLC v. United States*, 165 Fed. Cl. 650 (2023), which held that FAR 52.204-7(b)(1) requires offerors to be continuously registered from the time of proposal submission through award.  AR 20397–98.

In response to Plaintiff's protests, the NGA decided to take corrective action.  AR 20543.  In its notice filed with the GAO, the NGA noted that the Agency had already taken corrective action in response to a prior, separate protest of the CLOVER procurement on the basis that the NGA "had identified inconsistencies in its evaluation documentation[.]"  AR 20543.  For that reason, the NGA decided to "reassess the relevant experience, past performance, and risk assessment volumes of that protestor and the awardees."  *Id.*  The NGA proposed to take the same corrective action here with respect to Plaintiff's proposal.  *Id.*  It also "reserve[d] the right to implement any other corrective action it deem[ed] appropriate."  *Id.*  Following re-evaluation of the seven offerors, the NGA plans to make new award decisions.  *Id.*

Plaintiff responded to the NGA's notice, asking that the NGA clarify whether during re-evaluation the NGA would confirm that offerors did not have SAM registration lapses after proposal submission.  AR 20545–46.  The NGA's reply clarified that it would "ensure that all awardees have complied with FAR 52.204-7(b)(1)," but cautioned that application of the provision was "not as straightforward as [Plaintiff] indicates."  AR 20547.  The NGA further explained that it would "conduct a factual investigation" into the SAM registration status of the remaining offerors and "reasonably interpret and apply FAR 52.204-7(b)(1) based on the specific language

contained in the solicitation and current precedent at the Court of Federal Claims and GAO."  *Id.*
At the NGA's request, the GAO dismissed the protest as academic.  AR 20550–51.

### D.     Corrective Action

On September 11, 2023, the NGA approved an individual deviation from FAR 52.204-7
for the CLOVER procurement.  AR 20552.  Under the deviation, offerors are "required to be
registered in SAM when (i) submitting an offer or quotation, (ii) at the time of award, and (iii)
during performance, and through final payment . . . ."  AR 20557.  In other words, the deviation
specifically eliminates the obligation of continuous registration between proposal submission and
award.  The deviation also specifies that the NGA will "verify SAM registration at the time of
proposal submission and prior to award."  AR 20556.  The NGA Office of Contract Services
("OCS") drafted a memorandum ("Talking Paper") explaining the basis for the deviation request.
AR 20553–56.  The Talking Paper explained that the one-time deviation to remove the continuous
registration requirement was "necessary to clarify the agency's original intent for the CLOVER
Solicitation and enable award to an offeror that had a lapse in SAM registration between proposal
submission and time of award."  AR 20553.  The Talking Paper further explained that, in response
to *Myriddian*, OCS "developed clarifying solicitation language that specifically addresses NGA's
approach for SAM registration."  AR 20554; *see* AR 20556.  In addition, OCS requested the
deviation "to ensure that the CLOVER award can be made to the best value proposals based on
the stated evaluation criteria, and that offerors are not eliminated solely due to a lapse in SAM
registration."  AR 20554.  Taking into consideration the "guiding principles" of the federal
acquisition system, OCS concluded that the "registration lapses here do not necessarily affect an
awardee's intent, obligation, or ability to perform the awarded contract."  *Id.* (noting that "[t]o
ensure fairness, the contracting officer should be able to consider the terms of the solicitation and

the circumstances").  The Talking Paper further explained that continuously monitoring SAM registrations was not administratively practical.  *Id.*  Finally, the Talking Paper explained that the deviation requested was not precluded by law, and concluded as follows:

> Preserving the ability to make best value contract awards is of the highest priority to NGA, the Federal Government, and US taxpayers.  Removing best value offerors from consideration for contract awards based on a lapse in SAM registration is not in the NGA's best interests for the CLOVER procurement.

AR 20555.  The Deputy Director of the NGA approved the deviation on September 11, 2023.  AR 20552.

On September 18, 2023, the NGA issued Amendment 0007, which incorporated the deviation, changed the period of performance for the CLOVER contracts, and requested that offerors submit new labor rates or re-certify their previously submitted labor rates.  AR 20559–62. Amendments 0008 and 0009 clarified that FAR 52.204-7 is a solicitation provision, rather than a contract clause, and the deviation therefore applies to Section L (Instructions, Conditions, and Notices to Bidders) instead of Section I (Contract Clauses).  AR 20563–68.  Responses to the amended Solicitation were due October 2, 2023.  AR 20560.

### E.    This Litigation

On August 24, 2023, several weeks before the NGA approved the deviation, Plaintiff filed the instant suit challenging the corrective action.  *See* Pl.'s Compl., ECF No. 1.  After the NGA issued Amendment 0007, Plaintiff filed its Amended Complaint.  *See* Pl.'s Am. Compl., ECF No. 43.  Plaintiff alleges that the NGA's corrective action, including the issuance of the deviation, was arbitrary, capricious, and not in accordance with law.  *See generally id.*  It requests that the Court permanently enjoin the Agency from proceeding with the corrective action and order it to disqualify offerors who failed to comply with FAR 52.204-7, re-evaluate all remaining eligible

proposals in accordance with the terms of the Solicitation, and render new award decisions.  *See id.* at 34–35 (Prayer for Relief).

Consistent with the Court's scheduling order, Plaintiff moved for judgment on the administrative record.  *See* Pl.'s Mem. in Supp. of Mot. for J. on Admin. R., ECF No. 52-1.  The Government and three Defendant-Intervenors cross-moved for judgment on the administrative record.  *See* Def.'s Mot. for J. on Admin. R. & Resp., ECF No. 54; Compass' Mem. in Supp. of Cross-Mot. & Resp., ECF No. 55-1; Credence Dynamo' Mem. in Supp. of Cross-Mot. & Resp., ECF No. 57-1; Exacta's Cross-Mot. & Resp., ECF No. 60.[2]  The motions are now fully briefed.  *See* Pl.'s Resp. & Reply, ECF No. 61; Credence Dynamo's Reply, ECF No. 65; Compass' Reply, ECF No. 66; Exacta's Reply, ECF No. 68; Def.'s Reply, ECF No. 69.  The Court held oral argument on May 2, 2024.

After oral argument, the Court requested supplemental briefing from the parties to address two potentially relevant cases, *EP Productions, Inc. v. United States*, 63 Fed. Cl. 220 (2005), and *BAE Systems Norfolk Ship Repair, Inc. v. United States*, 163 Fed. Cl. 217 (2022), that the parties did not discuss in their briefs.  *See* Order for Suppl. Briefing, ECF No. 88.  Each party filed a supplemental brief.  *See* Def.'s Suppl. Br., ECF No. 91; Logic Gate's Suppl. Br., ECF No. 92; Credence Dynamo's Suppl. Br., ECF No. 93; Compass' Suppl. Br., ECF No. 94; Exacta's Suppl. Br., ECF No. 95; Pl.'s Suppl. Br., ECF No. 96.

---

[2] Logic Gate did not take a position in the briefing.  However, at oral argument, counsel for Logic Gate indicated that it supported the Government's position in its cross-motion.

## II.    LEGAL STANDARDS

### A.    Motion for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC") governs motions for judgment on the administrative record.  Such motions are "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.    Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ."  28 U.S.C. § 1491(b)(1).  In such actions, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act.  *Id.* § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  The statute requires the Court to perform a two-step inquiry.  *Bannum, Inc.*, 404 F.3d at 1351.

First, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Impresa*

*Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).

Under such review, an "award may be set aside if either: (1) the procurement official's decision

lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or

procedure." *Impresa*, 238 F.3d at 1332.  In reviewing an agency's procurement decisions, the

Court may not substitute its judgment for that of the agency.  *See Redland Genstar, Inc. v. United*

*States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997);

*see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must

be afforded to an agency's . . . procurement decisions if they have a rational basis and do not

violate applicable law or regulations").

Second, if the Court finds that the agency's action was arbitrary, capricious, or contrary to

law, it must apply the rule of prejudicial error.  *Bannum*, 404 F.3d at 1351 (citing 5 U.S.C. § 706).

At this step, the "protestor must show a significant, prejudicial error in the procurement process."

*WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa*

*Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C.

§ 706 ("due account shall be taken of the rule of prejudicial error").  Courts have developed two

standards to assess whether a procurement error prejudiced the plaintiff: one typically applicable

to post-award protests, and the other to pre-award protests.

In post-award protests, the protestor must show that, but for the challenged error, the

protestor had a substantial chance of receiving a contract award.  *Off. Design Grp. v. United States*,

951 F.3d 1366, 1373–74 (Fed. Cir. 2020).  In pre-award protests, however, "it is difficult, if not

impossible, to establish a substantial chance of winning the contract prior to the submission of any

bids."  *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citing *Weeks*

*Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009)).  Accordingly, the United

States Court of Appeals for the Federal Circuit has approved a different standard, more frequently applied in the standing context, which requires the Court to assess whether the agency's error caused the protestor to suffer a "non-trivial competitive injury." *Weeks Marine*, 575 F.3d at 1362. A court should still apply the "substantial chance" standard, however, in pre-award cases where there is "an adequate factual predicate" to apply the test. *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1292 n.3 (Fed. Cir. 2020); *see generally Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 563–64 (2021) (explaining that the "substantial chance" standard should apply when there are sufficient facts before the court to apply it).

### III. DISCUSSION

This dispute concerns the NGA's efforts to keep three awardees whose SAM registrations lapsed in violation of the FAR and the Solicitation in contention for award. To that end, the NGA issued an individual deviation removing the continuous registration requirement imposed by FAR 52.204-7(b)(1) from the Solicitation. Plaintiff argues that the deviation was arbitrary, capricious, contrary to applicable regulations, and done without observance of required procedures. The Court concludes that the NGA's decision to issue the deviation was arbitrary and capricious, and that Plaintiff is prejudiced by the deviation.

### A.   The Initial Offer Date is the Relevant Offer Date for the Purpose of Applying FAR 52.204-7(b)(1).

As an initial matter, the Court must assess when the SAM registration requirement starts. The Government argues that FAR 52.204-7(b)(1) only requires offerors in this procurement to be registered from the time they submit a response to the most recent (post-award) amended Solicitation (*i.e.*, Amendments 0007 and 0008). *See* ECF No. 54 at 19–24. As it explains, the offers that the NGA evaluated prior to the original contract awards have since expired and cannot be accepted. *Id.* at 20. Because Amendment 0007 requires offerors to re-validate their offers and

allows them to re-certify or revise their labor rates, these responses constitute the sole offers that will ultimately form the basis for awards under the corrective action, and by extension, are the triggering event for applying the SAM registration requirement here.  *Id.* at 20–22.  According to the Government, any offeror's prior lapse in SAM registration is irrelevant.  *Id.* at 23.  The Court disagrees.

As discussed above, FAR 52.204-7(b)(1) requires offerors to be continuously registered in SAM from the time of offer through award and performance.  The regulation provides as follows:

> An Offeror is required to be registered in SAM when submitting an offer or quotation, and shall continue to be registered until time of award, during performance, and through final payment of any contract, basic agreement, basic ordering agreement, or blanket purchasing agreement resulting from this solicitation.

48 C.F.R. § 52.204-7(b)(1).  The question raised by the Government's argument is whether "an offer" refers to the offer forming the basis of the challenged award, or any offer submitted in the course of the procurement.

Even assuming that the responses to Amendments 0007 and 0008 are new offers and legally distinct from the offers previously evaluated, the Court concludes that the regulation requires offerors to be continuously registered from the time the offerors submit their initial offers.  This is supported by the plain text of FAR 52.204-7(b)(1).  The regulation does not, as the Government suggests, specify that the registration requirement is triggered by submission of *the* offer that forms the basis of the eventual award.  Rather, the provision introduces the word "offer" with an indefinite article, requiring that offerors be registered "when submitting *an* offer."  *Id.* (emphasis added).  The use of an indefinite article comports with the expectation that a single offeror may submit multiple offers over the course of a procurement.  *See Niz-Chavez v. Garland*, 593 U.S. 155, 163–64 (2021) (explaining that an indefinite article can be used to refer to more than

one item).  Indeed, the potential for multiple offer submissions prior to award—either in response to a solicitation amendment or following discussions—is a fundamental feature of a negotiated procurement under FAR Part 15.  *See* 48 C.F.R. §§ 15.206(c), 15.306(d), 15.307.

Moreover, courts (including this one) confronted with ineligibility claims based on violations of the SAM registration requirement have not hesitated in enforcing FAR 52.204-7(b)(1) based on an offeror's non-compliance as of the date of its initial offer, even where the offeror later submitted revised offers.  *See Thalle/Nicholson Joint Venture v. United States*, 164 Fed. Cl. 224, 229–30, 233–34 (2023) (summarizing discussions and proposal revisions, and holding that protestor was ineligible for award based on failure to be registered as of the time it submitted its initial proposal); *Indep. Rough Terrain Ctr., LLC v. United States*, 172 Fed. Cl. 250, 254, 260–61 (2024) (summarizing correction action involving proposal revision, and holding that protestor lacked standing based on a SAM registration lapse between initial offer and award).  Like the re-validated offers here, the revised offers in those cases superseded the initial offers, becoming the only offers that the procuring agencies could legally accept; yet, each court's decision used the initial submission date as the triggering event for the SAM registration requirement.  The Court sees no principled reason for a departure in this case.

Using the initial offer date to determine compliance is also consistent with the purpose of FAR 52.204-7.  The regulation was amended in 2018 to clarify that offerors must be registered in SAM when they submit offers.  *See* 83 Fed. Reg. 48,691-01 (Sept. 18, 2018); 81 Fed. Reg. 31,895-01 (May 20, 2016).  Previously, the regulation required only that offerors be registered prior to award.  *See id.*  As noted above, negotiated procurements like this one may involve several revisions of offers which, by the Government's reasoning, should each be considered a new offer. The Government's interpretation would therefore allow bidders to avoid registering in SAM until

14

the final stages of the procurement process.  The regulation incentivizes offerors to do the opposite.  *See* 48 C.F.R. § 52-204.7(d) (advising offerors to take processing time into consideration and encouraging them to apply for registration "immediately upon receipt of [the] solicitation").  The Government's reading therefore contravenes the purpose of amending the regulation to require registration at the outset of the procurement process.

The Government contends that, under *STG International v. the United States*, 165 Fed. Cl. 577 (2023), offerors cannot be disqualified for lapses in SAM registration that occurred prior to the submission of their most recent offers.  ECF No. 54 at 22.  In that case, the court held that the SAM registration requirement did not apply until the second phase of a two-phase procurement when offerors submitted proposals that met the legal definition of an offer.  *STG Int'l*, 165 Fed. Cl. at 583–84.  Notably, the phase one submissions in *STG International* addressed only corporate experience, scenario, and capability, where the offerors presented information on the first two factors in an oral presentation and the third factor in a written submission.  *Id.* at 581, 583.  The court held that the phase one proposal did not meet the legal definition of an offer because it did not include all the essential terms necessary to create a binding contract.  *Id.* at 583 (holding that a price proposal, which offerors provided in phase two, was necessary to constitute an offer).  Here, there is no dispute that the offerors' initial proposals in response to the Solicitation were legally valid offers.  Unlike the phase one submissions in *STG International*, FAR 52.204-7(b)(1) applied to those initial offers when they were submitted.  Those offers may have expired since the original contract awards, but that does not mean they ceased to exist.  An expired offer is still "an offer" within the meaning of the regulation.

Accordingly, the relevant triggering event for purposes of the SAM registration requirement in this procurement is the date the offerors submitted their initial proposals, which was on or about March 29, 2022.

### B.   The Deviation Was Arbitrary and Capricious.

Since the awardees' lapses would affect their eligibility for award, the Court must determine whether the NGA's deviation from the SAM registration requirement was arbitrary and capricious or not in accordance with law.   The Agency provided three rationales for issuing a deviation that eliminates the continuous registration aspect of the requirement: (1) the NGA wished to clarify its intent that the SAM registration requirement not be continuous; (2) the continuous registration requirement is not administratively practical for the NGA; and (3) the NGA wished to award contracts to the best value offerors and not eliminate offerors based solely on a lapse in SAM registration.   AR 20553–55.   None of the reasons provided withstand scrutiny under the applicable standard of review.

The first rationale purports to "clarify the agency's original intent for the CLOVER Solicitation."   AR 20553.   According to the Talking Paper, unlike the solicitation at issue in *Myriddian*, the Solicitation here was supposed to provide discretion to the contracting officer to waive non-compliance with eligibility requirements.   *Id.* (quoting the Solicitation, "Failure to comply with [Section L] requirements **may** result in an Offeror's proposal being deemed non-compliant and unawardable[.]" (emphasis added in Talking Paper)); *see* ECF No. 54 at 25.   But this rationale is inconsistent with the plain language of FAR 52.204-7(b)(1), which provides that an offeror "*shall* continue to be registered" from submission of offer until time of award and through performance.   48 C.F.R. § 52.204-7(b)(1) (emphasis added); *see Myriddian*, 165 Fed. Cl. at 656 ("[R]egistration in SAM is mandatory under FAR 52.204-7(b)(1).").   Accordingly, a lapse

in SAM registration renders an offeror ineligible for award, and a procuring agency lacks discretion to waive the requirement. *Myriddian*, 165 Fed. Cl. at 657; *see GS4 Secure Integration LLC v. United States*, No. 21-1817C, 2022 WL 211023, at *5 (Fed. Cl. Jan. 24, 2022) (explaining that the revised version of FAR 52.204-7 no longer provides contracting officers with discretion as to when to require SAM registration). Even if the Agency misinterpreted the mandatory nature of the regulation, the requirement is clear and unambiguous. *See id.* Issuing a post-award deviation to "clarify" that the Agency never intended to follow the plain language of a mandatory FAR requirement is not rational.

Additionally, the original intent rationale is contrary to the NGA's representation to the GAO. In its reply to Plaintiff's response to the corrective action notice, the Agency stated that it would "reasonably interpret and apply FAR 52.204-7(b)(1) based on the specific language contained in the solicitation and current precedent at the Court of Federal Claims and GAO." AR 20547. The deviation did the exact opposite: it changed the language of the Solicitation in an attempt to distinguish the procurement from the precedent (*i.e.*, *Myriddian*) and avoid applying the continuous registration requirement found in the plain text of the regulation.

The second rationale is similarly irrational. The Talking Paper explained that the deviation was necessary to clarify when the Agency would be checking SAM registration status, as monitoring each offeror's registration would be administratively burdensome. The NGA appears to misread *Myriddian* as requiring agencies to continually check the registrations of offerors. AR 20554 ("Further, continual monitoring of SAM registrations was and is not administratively practical here and could result in a scenario where contract award decisions are made and then have to be set aside if a lapse occurs after the decision but prior to award."). The Court agrees that such a requirement would be administratively burdensome. *Myriddian*, however, expressly

17

disclaimed that its ruling "should be construed as imposing a requirement that an agency confirm an offeror's compliance with FAR 52.204-7." 165 Fed. Cl. at 657 n.5 ("The FAR does not impose such a requirement, and the Court doubts its authority to do so."). Rather, all that the regulation requires is that offerors properly maintain their SAM registration, and as a result, the Government may not award a contract to an offeror who was not registered in SAM at time of offer or award, or whose registration lapsed after it submitted an offer. *See* 48 C.F.R. § 52.204-7(b)(1). Verifying an offeror's SAM registration at the time of proposal submission and prior to award, as the Agency set forth in its deviation (AR 20556), would similarly reveal any interim lapse in registration; no additional monitoring is required.

The third rationale is a closer question, but ultimately fails to support the NGA's deviation decision. The discussion section of the Talking Paper began by acknowledging that "[t]hree of the original CLOVER awardees had brief lapses in their SAM registration during the source selection process, though their registrations were active at the time of proposal submission and contract award." AR 20553. It also acknowledged that Plaintiff was requesting that the NGA disqualify these awardees for that reason. *Id.* The Talking Paper did not dispute that the three awardees had SAM registration lapses during the procurement process, nor do any parties dispute that the awardees were therefore ineligible for award. Instead, seemingly recognizing the legal effect of the lapses, the Agency explained that a deviation was necessary so that the Agency could "[p]reserve the ability to make best value contract awards" and not "[r]emov[e] best value offerors from consideration for contract awards based on a lapse in SAM registration[.]" AR 20555.

Ordinarily the Government may amend a solicitation to change or clarify requirements, with the stated purpose of securing the best value contract. *See, e.g.*, *EP Prods.*, 63 Fed. Cl. at 225–26 (upholding decision to amend solicitation to change facility acceptability requirement that

seven of eight offerors failed); *ManTech Telecomms. & Info. Sys. Corp.*, 49 Fed. Cl. 57, 74–75 (2001), *aff'd*, 30 F. App'x 995 (Fed. Cir. 2002) (upholding amendment that clarified pricing requirements and altered technical requirements where action was proposed to ensure agency could make most advantageous award).  The Government may also change solicitation requirements in order to ensure adequate competition for award.  *See Bae Sys.*, 163 Fed. Cl. at 238 (upholding cancelation of original solicitation and issuance of new solicitation that relaxed a requirement where agency received only one offer in response to original solicitation and evidence showed that potential second offeror did not bid due to requirement).  These actions can be justified on the basis that they promoted competition, thereby allowing the Government to make the best value award.  *See id.*; *EP Prods.*, 63 Fed. Cl. at 225–26.

However, solicitation amendments that "have the effect of conforming the solicitation precisely to" a particular offeror's proposal are of concern.  *Pro. Serv. Indus., Inc. v. United States*, 129 Fed. Cl. 190, 206 (2016) ("The agency's corrective action, in other words, gives the appearance of securing a result that is precisely the opposite of what the procurement rules ordinarily require.  For rather than ensuring that an offeror's proposal conform strictly to the requirements of the solicitation, the agency has changed the solicitation to conform to an offeror's proposal.").  To sustain such a concern, courts typically require the protestor to establish bad faith on the part of the agency.  *See EP Prods.*, 63 Fed. Cl. at 225–26 (explaining that courts review the propriety of a solicitation amendment by asking "whether the action is taken 'in good faith, without the specific intent of changing a particular offeror's technical ranking or avoiding an award to a particular offer'" (quoting *Matter of: Federal Sec. Sys., Inc.*, B–281745.2, 1999 WL 292729, at *3 (Comp. Gen. Apr. 29, 1999))); *ManTech*, 49 Fed. Cl. at 74 ("ManTech does not allege, nor is there any evidence that suggests, the Army here is acting in bad faith, actuated by *animus*, with a specific

19

intent to harm ManTech . . . [or] of changing Lockheed Martin's ranking[.]" (emphasis in original)).

Here, the Government similarly purports to justify the Agency's deviation decision on the basis that it promotes competition, thereby allowing the NGA to award contracts to the best value offerors. *See* ECF No. 54 at 34; ECF No. 69 at 20 (citing AR 20555); AR 20553–55. The deviation cannot be justified on that basis. Unlike the circumstances in the aforementioned cases, there is no evidence in the record that the pool of offerors competing for CLOVER awards would be significantly narrowed absent the deviation. In both *EP Productions* and *Bae Systems*, the challenged agency decision was motivated by the fact that the procuring agency would have been left with only one offeror for the contract award unless it modified the solicitation requirement that was negatively affecting competition. *See EP Prods.*, 63 Fed. Cl. at 222 (seven of eight offerors deficient under facility acceptability requirement); *Bae Sys.*, 163 Fed. Cl. at 224 (one offer in response to original solicitation). Competition thus provided a strong rationale to change solicitation requirements to allow other offerors to either proceed through the evaluation or submit an initial offer. *Id.* In this case, the Talking Paper implicitly recognized that three of the 21 offerors who made it to the evaluation stage would be ineligible for award due to lapses in SAM registration, leaving 18 eligible offerors competing for five contracts.

Indeed, the Talking Paper did not use the word "competition," nor did it express a concern that, absent a deviation, there would be inadequate competition for the CLOVER contracts. *See* AR 20552–55. What the Talking Paper expressed concern for is the potential removal of "best value offerors"—*i.e.*, the highest rated offerors—from consideration for award. AR 20555. In other words, the Agency did not issue the deviation so that any and all offerors would remain in contention, it wanted to "ensure that the CLOVER award can be made to the best value proposals,"

even if they otherwise would have been eliminated for lapsed SAM registrations.  AR 20554.  The lack of a valid competition rationale is further bolstered by the Solicitation amendment that incorporated the deviation, which advised offerors "to consider where their team was ranked in the prior CLOVER evaluation before expending additional resources in response to this amendment." AR 20562.  If the NGA were concerned about the total number of offers it would have to consider for awards, it would not have encouraged lower ranking offerors to sit out during the re-evaluation.[3]

This case is also distinguishable on the basis that the NGA issued a deviation from a mandatory regulatory provision, not an amendment to clarify or change the Solicitation based on its own requirements.  The cases discussed above demonstrate that, "as a general rule, in a negotiated procurement, the contracting agency has broad discretion to amend the solicitation when it determines that such action is necessary to ensure fair and impartial competition and to permit the government to obtain its minimum requirements at the most favorable price." *ManTech*, 49 Fed. Cl. at 73; *see EP Prods.*, 63 Fed. Cl. at 224–25 (discussing FAR 15.206(a)).  The fact that the NGA deviated from a FAR requirement, rather than a technical or other requirement that the Agency chose to impose in drafting the Solicitation, cuts against the NGA's argument that changing the SAM registration requirement was necessary to obtaining the best value contract awards.

In *EP Productions*, for example, the solicitation issued by the procuring agency provided for a multi-stage evaluation process, in which the agency would disqualify offerors who failed an initial facility acceptability determination.  63 Fed. Cl. at 221 (summarizing solicitation for

---

[3]  Additionally, if potential removal of three offerors caused the Agency concern about adequate competition, the Court questions why the corrective action did not also allow the two offerors eliminated in the initial screening to cure their deficiencies and be further considered.

contract to provide meeting planning and organizational assistance for the agency's annual training conference).  When the contracting officer determined that seven of the eight offerors did not meet the acceptability requirement, the agency decided to issue an amendment to "remove the restrictive acceptability determination on the facility and allow all Offerors an opportunity to correct and/or replace facilities as necessary."  *Id.* at 222; *see Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 220 (2011) (upholding amendment that clarified how agency would use certain information during technical/management evaluation and allowing offer revisions for bidders to provide more relevant information to "ensure [the agency] will obtain the best possible value in the procurement").

Here, the solicitation requirement that would disqualify offerors is imposed by the FAR. *See* 48 C.F.R. § 4.1105(a)(1) (directing the insertion of FAR 52.204-7 in all solicitations unless certain exceptions apply).  The Talking Paper does not directly or indirectly tie the deviation from the SAM registration provision to any specific need or requirement pertaining to the CLOVER contracts, other than stating that the continuous registration aspect of the requirement prevents the Agency from considering best value offerors for contract awards.  AR 20555; *see* 48 C.F.R. § 1.402(a) ("Unless precluded by law, executive order, or regulation, deviations from the FAR may be granted as specified in this subpart when necessary to meet the specific needs and requirements of each agency.").  For a mandatory FAR requirement to have any effect at all, agencies cannot rationally justify a deviation from the requirement in a post-award corrective action posture whenever the requirement prevents the agency from awarding the contract to an otherwise successful offeror.  That reasoning lacks a limiting principle and would allow the Government to sidestep any and all mandatory FAR requirements whenever a requirement operates to exclude a putative awardee.

To be sure, no law or regulation prevents the NGA from deviating from FAR 52.204-7. Such provision does not appear in the list of FAR requirements from which agencies may not deviate. *See* 48 C.F.R. § 1.402. Several agencies, including the Department of Defense, have issued class deviations from that requirement. *See, e.g.*, Class Deviation From the Acquisition Regulation Provision at 52.204-7, System for Award Management (Sept. 6, 2023) (deviation issued by the Department of Energy); Class Deviation—Verification of Eligibility of Small Business Joint Ventures, DARS Tracking No. 2023-O0001 (Oct. 22, 2022) (deviation issued by the Department of Defense). But review under the arbitrary and capricious standard does not just look to whether an action was permissible—it requires that a legally permissible action also be rational. The NGA has not provided a rational basis for the deviation here.

In addition to the above arguments, Plaintiff asserts that the deviation was made "with the intent of allowing for re-award to [the NGA's] preferred awardees[.]" ECF No. 96 at 8. Plaintiff, however, disclaims that it is arguing bad faith. *Id.* Exacta argues, and the Court agrees, that the content of Plaintiff's argument is that the NGA acted in bad faith, regardless of Plaintiff's characterization. *See* ECF No. 95 at 3–5. Plaintiff's assertion that the Government had "preferred awardees" is "the type[] of concern" that is "subsumed and fully addressed in the context of the standard courts have employed" in assessing whether an amendment was made in bad faith. *EP Prods.*, 63 Fed. Cl. at 225. Indeed, courts have construed arguments that an agency made solicitation changes to steer an award to (or away from) a particular offeror as bad-faith arguments. *See Bae Sys.*, 163 Fed. Cl. at 237; *Jacobs*, 100 Fed. Cl. at 220; *ManTech*, 49 Fed. Cl. at 74. That is in essence Plaintiff's claim: having already identified Credence, Exacta, and Innovate Now as awardees, the deviation ensures that the Agency can re-award contracts to these offerors upon re-evaluation. *See* ECF No. 61 at 19. Accordingly, the bad faith standard applies.

The Court shares Plaintiff's concerns.  The impetus for the deviation is clear from the Talking Paper.  "Three of the original CLOVER awardees had brief lapses in their SAM registration."  AR 20553.  In response to Plaintiff's GAO protest challenging these awardees' eligibility for award, the Agency issued a deviation that eliminates only the continuous registration aspect of the FAR's SAM registration requirement—*i.e.*, the specific part of the provision that renders the awardees' offers non-compliant.  AR 20557.  It did so "to ensure that the CLOVER awards can be made to the *best value proposals*" and so "offerors are not eliminated solely due to a lapse in SAM registration."  AR 20554 (emphasis added); *see* AR 20555 ("Removing *best value offerors* from consideration for contract awards based on a lapse in SAM registration is not in NGA's best interests for the CLOVER procurement." (emphasis added)).

But "[t]here is a 'strong presumption that government contract officials exercise their duties in good faith' . . . .  In order to defeat this presumption, a protestor must present 'well-nigh irrefragable proof' that the government officials did not act in good faith."  *Bae Sys.*, 163 Fed. Cl. at 238 (internal citations omitted).  The NGA's corrective action involves more than the deviation. It intends to "reassess[] the relevant experience, past performance, and risk assessment volumes" of proposals, and presumably the prices for any top five offeror who submits a revised price proposal.  AR 20543, 20560.  Plaintiff has not provided any support for its contention that the Agency intends to "re-issue awards to its pre-selected, but ineligible offerors."  ECF No. 52-1 at 24; *see id.* at 26 (claiming that the "the Agency  . . . has no actual intention of substantively or meaningfully reconsidering proposals or correcting conceded errors in its evaluations, but rather only intends to manipulate its evaluation criteria to ratify the outcome of its previous . . . evaluations").  Although the Agency clearly seeks to keep Credence, Exacta, and Innovate Now

in consideration, there is no "irrefragable proof" that these offerors are "preferred" or "pre-selected," or that the corrective action is a sham.

Plaintiff correctly asserts, however, that it need not show bad faith in order to prevail. *See* ECF No. 96 at 8. As discussed above, because the Government's decision to deviate from the continuous SAM registration requirement lacks a rational basis, Plaintiff need not prevail on the question of bad faith in order for the Court to rule in its favor.[4] *See Tech. Elec. Warfare, LLC v. United States*, 164 Fed. Cl. 407, 421 (2023).

## C.    Plaintiff Is Prejudiced by the Deviation.

Having found that the deviation was arbitrary and capricious, the Court next addresses whether Plaintiff has shown prejudice. Plaintiff argues that it will suffer "a non-trivial competitive injury" as a result of the deviation and that it has a "substantial likelihood" of obtaining the contract award upon a rational and lawful re-evaluation during corrective action. *See* ECF No. 61 at 27–30. Several Defendant-Intervenors respond by pointing out Plaintiff's very low validated score in the original evaluation, which left Plaintiff ranked 19th out of 21 offerors. *See* ECF No. 55-1 at 7–8; ECF No. 60 at 37–38. The Government characterizes Plaintiff's assertion of harm as "speculative" because the Agency's corrective action is ongoing and "[Plaintiff] may win a contract award following the Agency's . . . re-evaluation of proposals." ECF No. 69 at 24. Alternatively, it joins Defendant-Intervenors in arguing that Plaintiff "cannot demonstrate that the Agency's corrective action has impacted its likelihood of receiving a contract award" if Plaintiff's

---

[4] Because the Court finds that the deviation is arbitrary and capricious based on the substantive rationale provided by the NGA, the Court need not address Plaintiff's claims that the deviation was also procedurally defective. *See* ECF No. 52-1 at 12–16 (arguing that the NGA improperly issued an individual, rather than class, deviation; failed to adhere to the requirements of DFARS 201.402 when issuing the deviation; and failed to include FAR 52.252-5 in the Solicitation amendments).

re-evaluated score is so low that, even without the ineligible awardees in the competition, it still does not rank in the top five.  *Id.*

This protest presents a peculiar scenario for applying the prejudice standard.  It is both post-award, in that the Agency made awards after the original evaluation, and pre-award, in that the Agency's corrective action contemplates issuing new awards upon re-evaluation.  Given the ambivalent procedural posture of this protest, the Court must determine whether there is an adequate factual predicate to apply the "substantial chance" standard, *see Oracle Am.*, 975 F.3d at 1292 n.3, or whether the "non-trivial competitive injury" standard is appropriate, *Weeks Marine*, 575 F.3d at 1362.

In this case, the *Weeks Marine* standard is more apposite.  As Plaintiff correctly points out, the Court has no basis to conclude that the re-evaluation will yield the same result as the original evaluation.  ECF No. 61 at 28–29.  Although Plaintiff's proposal was not scored highly in the original evaluation and although offerors were not allowed to make any changes to their proposals other than revised labor rates, the NGA's re-evaluation is intended to correct errors in the initial evaluation process.  AR 20543.  The Court presumes the Agency will undertake the re-evaluation in good faith.  *See Spezzaferro v. F.A.A.*, 807 F.2d 169, 173 (Fed. Cir. 1986) ("Government officials are presumed to carry out their duties in good faith.").  The Administrative Record does not include any of the offerors' responses to Amendments 0007 and 0008 or any evaluation documents created during the corrective action.  Accordingly, it is impossible, at this stage, for the Court to ascertain whether Plaintiff has a substantial chance of receiving a contract if offerors with lapsed SAM registrations are excluded from the re-evaluation, and thus *Weeks Marine* should

apply.[5]  *See Jacobs*, 100 Fed. Cl. at 201, 207 (applying *Weeks Marine* to assess prejudice in pre-award protest of corrective action taken after original contract award).

To prevail under the *Weeks Marine* standard, Plaintiff must show that the Agency's error will cause it to suffer a "non-trivial competitive injury."  *Weeks Marine*, 575 F.3d at 1362.  To do so, Plaintiff must demonstrate that the deviation, as incorporated in the most recent amended Solicitation, "would prejudice [it] by imposing a significant competitive disadvantage."  *ICP Nw., LLC v. United States*, 98 Fed. Cl. 29, 36 (2011).  None of the parties have cited a decision that presents a similar factual scenario relevant to the prejudice inquiry here.  In most cases, courts have found that a protestor establishes a non-trivial competitive injury where the agency's action denied it the opportunity to compete for an award.  *See, e.g.*, *Golden Mfg. Co. v. United States*, 107 Fed. Cl. 264, 273 (2012) (holding that offeror was prejudiced by agency's denial of an opportunity to revise its proposal in response to a solicitation amendment where it was eliminated in the first phase of evaluation); *Google, Inc. v. United States*, 95 Fed. Cl. 661, 673–74 (2011) (holding that a plaintiff was prejudiced because the agency deprived it of an opportunity to compete for an award).  In at least one decision, *WinStar Communications, Inc. v. United States*, which articulated the non-trivial competitive injury test adopted in *Weeks Marine*, the court held that the protestor demonstrated prejudice where the agency's improper decision to award a single contract instead of multiple contracts deprived the protestor of the opportunity to compete for those additional awards and reduced its chance of receiving an award because the incumbent had a

---

[5] Because the Court has no ability to determine whether the results of the original evaluation will be predictive of the results of the re-evaluation, the Court rejects the arguments by Defendant-Intervenors that rely on Plaintiff's poor results in the original evaluation.  *See* ECF No. 55-1 at 7–8; ECF No. 60 at 37–38.

competitive advantage in a single-award procurement.  41 Fed. Cl. 748, 762–63 (1998).  Neither of these circumstances are presented here.

Here, the alleged competitive injury to Plaintiff is having to compete with ineligible offerors for an award during the re-evaluation, thus impacting its relative competitive standing. *See* ECF No. 52-1 at 30–31.  Several courts have found that an increase in the number of competitors for a contract award amounts to a non-trivial competitive injury.  In *National Air Cargo v. United States*, for example, the court held that an agency's wrongful inclusion of additional competitors for task orders under a multiple-award IDIQ contract inflicted a non-trivial competitive injury on the protestor.  126 Fed. Cl. 281, 295–96 (2016).  There, the procuring agency initially awarded five contracts, creating a pool of contractors that could compete for subsequent task orders.  *Id.* at 285–86.  The agency later added a sixth contractor to the pool, and one of the five initial awardees protested on the basis that the award to the sixth contractor violated the terms of the solicitation.  *Id.* at 286.  The court held that the protestor was an "interested party" under 28 U.S.C. § 1491(b)(1), and therefore had standing.[6]  *Id.* at 296.  Applying the non-trivial competitive injury standard from *Weeks Marine*, the court held that the allegedly unlawful award added an additional competitor to the pool, which amounted to such an injury.  *See id.* at 295.  Both the protestor and the Government agreed that the additional contractor would significantly increase competition for the task orders to be awarded to contractors within the pool.  *Id.*  Thus, the court

---

[6] Although prejudice and standing under § 1491(b) are separate inquiries, the prejudice determination made at the merits stage "employs the same standards as the prejudice determination for purposes of standing."  *L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 289 (2011); *see Jacobs*, 100 Fed. Cl. at 207.  Under § 1491(b), a protestor must be an "interested party" to have standing.  To demonstrate that it is an interested party, a protestor must show, among other things, that its "direct economic interest would be affected by the award of the contract or by the failure to award the contract."  *Weeks Marine*, 575 F.3d at 1359.  The "non-trivial competitive injury" test cuts to that requirement.  *See id.* at 1361–62.

concluded that the award to the sixth contractor created a non-trivial competitive injury. *Id.* (citing *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332–33 (Fed. Cir. 2008); *BayFirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 501 (2012); *URS Fed. Servs., Inc. v. United States*, 102 Fed. Cl. 664, 669 (2011)); *see also PAE-Parsons Global Logistics Servs., LLC v. United States*, 145 Fed. Cl. 194, 199–200 (2019) (similarly holding that a multiple-award IDIQ contract awardee had standing to challenge an award to an another offeror that would be included in the pool of contractors competing for task orders).

A subsequent case, *Aero Spray*, declined to follow *National Air Cargo*. In that case, as in *National Air Cargo*, an awardee of a multiple-award IDIQ contract challenged the award of IDIQ contracts to other offerors in the same procurement. *Id.* at 552. The protestor argued that it had standing to pursue the protest due to the economic harm it would suffer from increased future competition for task orders resulting from the allegedly improper IDIQ contract awards. *Id.* at 558. In performing the § 1491(b) standing analysis, the court focused on the fact that the protestor, having been awarded a contract under the solicitation, would not be entitled to receive the additional contract awards it was challenging (*i.e.*, the IDIQ awards to other offerors). *Id.* at 567–68. Acknowledging that "harm from future, increased competition (for task orders) would constitute a cognizable injury in fact sufficient to support standing" under the APA and Article III, the court rejected that harm as being sufficient to constitute a direct economic interest for purposes of supporting standing in a bid protest. *Id.* at 567. The court held that, under either the substantial chance or non-trivial competitive injury test, the protestor lacked standing. *Id.* at 569. As relevant here, the court explained that *Weeks Marine* "was concerned not with just any 'competitive injury' *resulting* from the procurement, but rather only to the extent the plaintiff would be harmed *within the competition* for the contract it sought." *Id.* at 568 (emphasis in original); *see id.* at 572 ("[T]he

'non-trivial competitive injury' [in the *Weeks Marine* test] is an injury suffered *in the competition for the contract(s)*, not something arising from the award(s)." (emphasis in original)).

Harm within the competition for one of the five CLOVER contracts is exactly what Plaintiff is claiming here. Thus, the question is whether Plaintiff is non-trivially injured by having to compete with 21 offerors, three of which would be ineligible to compete absent the deviation, versus 18 offerors.[7] The Court concludes that it is. The inclusion of these three additional, ineligible offerors concretely impacts Plaintiff's chances of obtaining one of the five contract awards. An increase in the number of offerors reduces Plaintiff's chances of obtaining an award, just as a decrease in the number of awards would reduce Plaintiff's chances of obtaining an award. *Cf. WinStar*, 41 Fed. Cl. at 762–63. To that end, the aforementioned cases all support the conclusion that the inclusion of ineligible offerors in the competition for the contract award that Plaintiff is seeking amounts to a non-trivial competitive injury. *See Nat'l Air Cargo*, 126 Fed. Cl. at 125; *Aero Spray*, 156 Fed. Cl. at 567; *PAE-Parsons*, 145 Fed. Cl. at 199. Accordingly, Plaintiff has shown that it is prejudiced by the NGA's deviation.

The Government argues that plaintiff is not prejudiced by the NGA's deviation on the basis that Plaintiff may ultimately obtain one of the CLOVER awards after the NGA completes the re-evaluation. ECF No. 69 at 24. If that were the case, the Court questions whether any plaintiff with standing to bring a pre-award bid protest that challenges the terms of a solicitation would be able to prove prejudice at the merits stage. Pursuant to well-established precedent, Plaintiff had to challenge the deviation and accompanying solicitation amendments before the NGA completed its

---

[7] Plaintiff asserts that 11 offerors had lapses in SAM registration. *See* ECF No. 52-1 at 31. Though the Court was able to verify that three original awardees (Credence, Exacta, and Innovate Now) had lapses in SAM registration, the other companies listed by Plaintiff were not in the group of 21 offerors evaluated by the NGA. *Compare id. with* AR 18350–51.

re-evaluation and made new award decisions, or else it would have waived its protest. *See Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007); *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1381–82 (Fed. Cir. 2012). To then deny its meritorious arguments because Plaintiff could possibly obtain a CLOVER contract upon re-evaluation would deprive Plaintiff of obtaining relief from the unlawful deviation. The Federal Circuit rejected a similar Catch-22 created by the confluence of *Blue & Gold* and the application of the "substantial chance" test when assessing standing in *Weeks Marine*. *See* 575 F.3d at 1360–63. There, the Circuit explained that, if the plaintiff did not have standing, it "effectively would be saying that this court has set up a judicial scheme whereby a party runs afoul of the waiver rule if it waits to challenge a solicitation (as *Blue & Gold* did) but is properly dismissed on standing grounds if it raises the challenge pre-award." *Id.* at 1363. The Court will not create a similarly anomalous result in this case.

### D.    Plaintiff is Entitled to Injunctive Relief.

Plaintiff requests that the Court enjoin the NGA from evaluating proposals in accordance with Amendments 0007 and 0008 and from proceeding with the corrective action under the deviation and amendments. ECF No. 52-1 at 32–35. To obtain permanent injunctive relief, Plaintiff must show that: (1) it prevailed on the merits; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the balance of hardships weighs in favor of granting injunctive relief; and (4) injunctive relief is in the public interest. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Under this standard, "[n]o one factor, taken individually, is necessarily dispositive[;] . . . the weakness of the showing regarding one factor may be overborne

by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).[8]  At

the very least, however, a protestor must actually succeed on the merits and demonstrate

irreparable harm.  *See CliniComp Int'l, Inc. v. United States*, 134 Fed. Cl. 736, 746 (2017) (citing

*Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009)), *aff'd*, 904

F.3d 1353 (Fed. Cir. 2018).  As explained above, Plaintiff has prevailed on the merits, and the first

factor therefore weighs in Plaintiff's favor.

Plaintiff argues that it will suffer irreparable harm by being deprived of the opportunity to

fairly compete for the CLOVER contract awards.  ECF No. 52-1 at 33.  The Government primarily

responds that, even if Plaintiff prevails on the merits, Plaintiff cannot show irreparable harm

because it could ultimately obtain a contract award as a result of the re-evaluation.  ECF No. 54 at

40–41.  To assess whether Plaintiff will suffer an irreparable injury if injunctive relief is denied,

"[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an

injunction."  *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2012) (quoting

*Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 743 (2000)).  Several courts have held that

denial of an opportunity to compete on a level playing field amounts to irreparable harm.  *See id.*

(citing *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 390–91 (2010); *Serco, Inc. v. United

States*, 81 Fed. Cl. 463, 501–02 (2008); *Impresa*, 52 Fed. Cl. at 828).  While Plaintiff has not been

denied the opportunity to compete for a contract, Plaintiff will be irreparably harmed if the Agency

proceeds with the re-evaluation under a deviation that allows ineligible offerors to continue to

compete against Plaintiff.  And in the absence of an injunction, Plaintiff has no other avenue to

---

[8] Although *FMC* concerns the award of a preliminary injunction, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction," except the plaintiff must show actual success, rather than a likelihood of success, on the merits to obtain a permanent injunction.  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).

remedy the harm caused by the unlawful application of the deviation to the Solicitation. *See COMINT Sys.*, 700 F.3d at 1381–82.

With respect to the third factor, the balance of hardships, Plaintiff argues that the NGA will not suffer harm because the deviation was unlawful, and that any offerors who would become ineligible for award would not be harmed because their proposals are not compliant with FAR 52.204-7.  ECF No. 52-1 at 34.  The Government responds that the NGA would suffer negative, long-term consequences from awarding contracts to offerors with lower scores.  ECF No. 54 at 41. This factor weighs in favor of the Government and Defendant-Intervenors.  Although Plaintiff would be denied the opportunity to fairly compete for an award absent injunctive relief, an injunction would deny certain offerors the opportunity to compete for a contract award altogether. In addition, the NGA would arguably be harmed if, in fact, it were prevented from awarding contracts to the highest rated offerors; although, as discussed, it is impossible at this stage for the Court to ascertain if that is the case given that the re-evaluation is not complete.  *See supra* § III.C. Ultimately, however, the weight of this factor is undermined by the fact that any top five offeror that is ineligible due to the Court's enjoining the deviation will be passed over for award because of its non-compliance with a mandatory regulatory requirement.

As for the fourth factor, the public interest, Plaintiff argues that the public has an interest in a lawful procurement.  ECF No. 52-1 at 34.  The Government argues that the public interest is best served by the NGA's re-evaluation and consideration of all remaining offerors, including those with SAM registration lapses.  ECF No. 54 at 41.  This factor weighs heavily in Plaintiff's favor because, as courts have repeatedly held, the public has "an interest in the fair and lawful procurement of goods and services by the government."  *Superior Optical Labs, Inc. v. United States*, 152 Fed. Cl. 319, 326 (2021), *aff'd*, 852 F. App'x 545 (Fed. Cir. 2021); *see Goodwill Indus.*

*of S. Fla., Inc. v. United States*, 162 Fed. Cl. 160, 213 (2022); *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 117 (2013); *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 551 (2010).

Upon consideration of all four factors, the Court concludes that injunctive relief is warranted.  Although an injunction means that awards made after the re-evaluation may not go to the highest rated (albeit ineligible) offerors, that factor is outweighed by Plaintiff's success on the merits, Plaintiff's lack of another avenue for redress, and most especially the public's interest in a lawful procurement.

## IV.  CONCLUSION

For these reasons, the Court **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 52) and **DENIES** the Government's and Defendant-Intervenors' Cross-Motions (ECF Nos. 54, 55, 57, 60).  The Court hereby sets aside the deviation approved on September 11, 2023, and enjoins the NGA from proceeding with the corrective action under Amendments 0007 and 0008 to the extent it incorporates such deviation.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**


Dated: August 29, 2024                                */s/ Kathryn C. Davis*
                                                                      KATHRYN C. DAVIS
                                                                      Judge